HOPKINS *v.* PETERS.

---

PETERS *v.* HOPKINS.

---

PETERS *v.* HOPKINS.

---

PATENTS; INTERFERENCE; DISCLOSURE; REDUCTION TO PRACTICE; EVIDENCE; DILIGENCE; ABANDONMENT OF APPLICATION; OPERATIVENESS.

1. A party in interference cannot prevail where he vaguely conceived the mere general result only nine days before the date of another party's filing and constructive reduction to practice, and his disclosure occurred a month after such filing date.

2. Conception and reduction to practice are sufficiently established where the inventor, two mechanics who worked upon the construction and are highly skilled in. the art, and two other persons, testify that the test, at which they were present, resulted in a successful operation, and fully explain the manner of operation. (Following *Boynton* v. *Taggart,* 40 App. D. C. 82, and *Seeberger* v. *Russel,* 26 App. D. C. 344.)

3. The extent and exact nature of a test are not, so long as the test was successful, material on the question of conception and reduction to practice of a device which was completed in all particulars as it appeared in evidence, and concededly contained the issue in interference.

4. The lapse of two and one-half years between conception and filing an application in interference does not, even in the absence of reduction to practice, show lack of diligence, where the device is most complicated, and the inventor completed within that time seven machines, each of which contained the issue, and filed, within three months after completing the last machine, the application, which contained thirty-six sheets of drawings, seventy-five typewritten pages of specifications, and four hundred and thirteen claims whose description required great care and skill.

5. The filing of an application in interference will not be taken as signifying an abandonment of a prior application concerning the same invention, merely because the prior application did not disclose the present issue, where the drawings filed in the Patent Office were completed two months before the completion of a part of the mechanism, and four months before the machine itself was completed, and it conclusively appears that at the time of filing the prior application the inventor had a machine showing the invention.

6. The operativeness or inoperativeness of a device showing the invention, which was disclosed in a prior application and is the basis of the claim of reduction to practice, is immaterial in passing on a present application involving the same invention, the applicant, in other respects, being entitled to priority.

7. Priority must be awarded to the party in interference whose conception antedates the other's several months, and who diligently reduced his invention to practice.

Nos. 869, 871, 872.   Patent Appeals.   Submitted November 14, 1913. Decided January 5, 1914.

HEARING on appeals from two decisions of the Commissioner of Patents in separate interference proceedings.

*Reversed* in 869 and 871.   *Affirmed* in 872.

The COURT in the opinion stated the facts as follows:

This is an appeal from two decisions of the Commissioner of Patents in separate interference proceedings embraced within a single record.

Appeal No. 872 is an interference wherein the party Heber C. Peters appeals from a decision of the Commissioner of Patents awarding priority of invention to the party Hubert Hopkins. The issue of the interference is in ten counts, but the following sufficiently illustrate the nature of the invention:

"1. In a calculating machine, the combination, with two groups of totalizer wheels, of means under control of the operator for transferring the number registered in either group to the other.

"2. In an adding and listing machine, the combination, with means for listing a series of items and accumulating the total thereof, and means for printing such total at the end of the series and clearing the machine, of a supplemental accumulator, means for transferring to said supplemental accumulator the totals of several series of items as said totals are printed at the ends of the respective series, so as to thereby accumulate upon' said supplemental accumulator a grand total of all the items in the several series, and means for printing such grand total from said supplemental accumulator."

"4. In an adding machine, the combination, with the adding and printing mechanisms thereof and with its longitudinally movable, paper carriages, of a platen mounted in the carriage and with which the printing mechanism co-operates, and a series of accumulators under the control of said paper carriage, and arranged to be operated through connection with the actuator instrumentalities of said usual adding mechanism, for separate accumulations.

"5. In an adding machine, the combination of a series of movable bars bearing type at one end, a set of racks at each end of the bars, a plurality of accumulators arranged to co-operate, one at a time, with the set of racks at the type-end of the bars, and a single accumulator arranged to co-operate with the other set of racks."

"7. In an adding and listing machine, the combination, with means for listing a series of items and an accumulator for accumulating the total thereof, and a total key and connections,

by depressing which key and operating the machine the total
of the series of items may be printed, of a supplemental accumu-
lator means for transferring to said accumulator the totals of
several series of items as said totals are successively printed at
the ends of the respective series of items, so as to thereby ac-
cumulate upon said supplemental accumulator a grand total of
all of the items in the several series, said means being set for
such purpose prior to the operation which prints the transferred
total, and a supplemental total key and connections, by impress-
ing which key and operating the machine such grand total may
be printed from said supplemental accumulator."

"10. In an adding machine, the combination, with the usual
adding and printing mechanism thereof and with its longitudi-
nally movable paper carriage, of a platen mounted in the car-
riage and with which the printing mechanism co-operates, and
a series of accumulators under the control of said paper carriage
in both directions of movement of the latter, and arranged to
be operated through connection with the actuator instrumen-
talities of said usual adding mechanism, for separate accumula-
tions."

The subject-matter of the various counts is defined by the
Examiner of Interferences as follows: "The invention, as de-
fined in count 1, relates particularly to a machine provided with
two groups of totalizer-wheels and means for transferring a
number registered in either group to the other. Counts 2, 3,
and 6 to 9, inclusive, define a machine comprising means for
listing a series of numbers and for registering the total of the
numbers listed in an accumulator, means for printing totals
registered in said accumulator and for transferring said totals
to a supplemental accumulator for the purpose of accumulating
a grand total of the totals of several series of numbers listed,
and means for printing the grand total registered in said supple-
mental accumulator. In each of counts 6 to 9 it is specified that
the transferring means is to be set prior to the operation which
results in printing and transferring the number. Counts 4 and
10 define a machine provided with accumulators under control

of the paper carriage. Count 10 specifies that they shall be so controlled in both directions of movement of the carriage. Count 5 defines a machine provided with type-carrying bars, having a set of racks at one end to co-operate with a plurality of accumulators, and a set of racks at the other end to co-operate with a single accumulator."

Appeals Nos. 869 and 871 relate to a tri-party interference, in which the party Hopkins and the party Peters appeal from a decision of the Commissioner awarding priority of invention to the party Isaac S. Dement. The issue of the interference is in seven counts, as follows:

"1. In a calculating machine, the combination, with actuating devices, of two independently operable groups of totalizer wheels, in operative relation thereto and normally disengaged therefrom, means of engaging both groups of totalizer wheels with said actuating devices, whereby a number registered in one group may be transferred into the other group, and means for disengaging the totalizer wheels originally containing said number from said actuating devices, whereby said totalizer wheels stand at zero when the number has been transferred to the other totalizer wheels.

"2. In a calculating machine, the combination, with actuating devices of two independently operable groups of totalizer wheels, in operative relation thereto, and normally disengaged therefrom, means for engaging one group of totalizer wheels with said actuating devices for the purpose of positioning said actuating devices, and means for engaging the other group of totalizer wheels with the positioned actuating devices.

"3. In a calculating machine, the combination, with actuating devices, of two independently operable groups of totalizer wheels in operative relation to said actuating devices, means whereby both groups may be engaged with and operated by said actuating devices, whereby a number registered in one group of totalizer wheels may be transferred to the other group of totalizer wheels, printing type which are positioned by said actuating devices; and means for causing said type to make a

printing impression and make a record of the number which is transferred from one totalizer to the other.

"4. The combination of a set of adding devices, stops for said devices to stop them and their operating means, when moving in the direction reverse to that of adding, as soon as such adding devices arrive at their zero position, operating means adapted to move said set of adding devices in said reverse direction, a second set of adding devices adapted to be so connected to said operating means that the movement of the first set of adding devices against their stops will be transmitted to the second set, whereby the total represented by the first set of adding devices may be added upon the second set.

"5. The combination of a set of adding devices, stops for said devices to stop them and their operating means, when moving in the direction reverse to that of adding, as soon as such adding devices arrive at their zero position, operating means adapted to have a reciprocating movement and to be connected in the initial part of said movement with the set of adding devices to move them in said reverse direction, a second set of adding devices adapted to be connected with the said operating means on the return part of their movement, whereby the total represented by the first set of adding devices may be added upon the second set.

"6. The combination of two sets of adding devices, stops for one set of such devices to stop them and the operating means when the adding devices reach their zero position, operating means adapted to be connected with both of said sets to transfer to one set the total standing upon the other set.

"7. The combination of two sets of adding devices, stops for one set of said devices to stop them and their operating connections, when moving in the direction reverse to that of adding, on reaching their zero position, and operating means adapted to be connected with both of said sets to add upon one set the total standing upon the other."

The invention is described by the Assistant Commissioner of Patents as follows: "The invention relates to registering and

recording machines in which there are two sets of adding wheels, and means by which an amount or accumulation may be passed from one set of adding wheels to the other. The machines disclosed by the several applications are specifically very different. The machine disclosed in the Hopkins application directly involved in this interference is a calculating machine, one of the principal objects being to provide for the multiplication of an amount set up on the adding wheels without repeatedly resetting said amount. The Peters device is essentially an adding machine, and its object is to provide for the accumulation of different items, securing the separate total of such sets of items, and eventually a grand total. Dement's device is essentially an improvement in cash registers, the object being to provide for the listing and adding of separate items and the printing of a balance at the end of the transaction."

*Mr. Frederick R. Cornwall, Mr. L. S. Bacon,* and *Mr. J. H. Milans* for Hopkins.

*Mr. R. C. Glass, Mr. C. H. Braselton,* and *Mr. Frank P. Davis* for Peters and Dement.

Mr. Justice VAN ORSDEL delivered the opinion of the Court:

We will first consider the tri-party interference. Dement took no testimony, and relies upon the date of filing his application, January 9, 1904, for constructive reduction to practice. Peters alleges conception of the invention on January 1, 1904, and disclosure February 11, 1904. He filed his application April 14, 1905. Hopkins claims conception and disclosure in October, 1902, and reduction to practice December 1, 1903. His application here in interference was filed April 9, 1906, and, for convenience, will hereafter be referred to as "Application No. 4." Hopkins had filed three prior applications,— "Application No. 1," January 14, 1904; "Application No. 2," September 24, 1904; and "Application No. 3," March 10, 1905. The third application purports to contain improvements dis-

closed in "Application No. 2." "Application No 4" is merely a consolidation or grouping of the matters contained in the earlier applications.

The Examiner of Interferences awarded priority to Hopkins, and the Board of Examiners-in-Chief and the Commissioner reversed this holding, and awarded priority to Dement, all the tribunals holding against Peters. A careful review of the record impels us to concur in that finding. In no view of the case can Peters be declared a prior inventor. He attempts to establish a date of conception about January 1, 1904, by his own testimony and that of another witness. This witness is uncertain as to the exact date, and this is important, since Dement filed nine days after the earliest date of conception claimed by Peters. There is nothing in the testimony of Peters or his witness to indicate that he disclosed the means by which the object of the invention was to be attained. Giving the testimony full credit, Peters had only a vague conception that a certain result could be obtained, without disclosing means for its accomplishment. On the other hand, conceding to Peters, for the purpose of argument, everything he claims as to his interview with his corroborating witness, he cannot claim the benefit of a disclosure prior to February 11, 1904, the date of disclosure alleged in his preliminary statement, and this would bring him more than a month after Dement's filing date. Without further reviewing the evidence, Peters will be eliminated from the case, and the investigation will be directed to the respective claims advanced by Hopkins and Dement. Dement has a single date, January 9, 1904, upon which he must stand or fall. With Peters out of the case, and Dement relying wholly upon his filing date, we will proceed to review Hopkins's case as disclosed in the record.

Contrary to the view of the tribunals of the Patent Office, we think Hopkins's case revolves about his first machine, known in this case as "Exhibit Machine No. 1." All of the tribunals found this machine, as exhibited in evidence, to be a physical embodiment of the invention, and it was conceded to be such by counsel at bar. With the general concession that all the

counts of the issue can be read on to this machine, an examination of Hopkins's proof as to its construction is most essential.

It appears that work was begun on the construction of this machine about September 4, 1903, and that it was built largely in accordance with Hopkins's exhibit drawings 1 to 15, from which his "Application No. 1" was prepared.

Hopkins testified with reference to his "Exhibit Machine No. 1" as follows:

Q. Was that machine ever completed?

A. It was.

Q. When was the adding mechanism thereof in such a stage of completion that it could be operated to demonstrate its practicability?

A. About the middle of December, 1903.

Q. Are you the H. Hopkins whose name appears on the payroll book beginning with page 91 thereof (Hopkins's Exhibit B) testified to by Mr. Sharp?

A. I am.

Q. When the machine was operated, or rather the adding mechanism thereof, about the middle of December, 1903, was such operation successful or otherwise?

A. It was successful.

Q. Who was present when the machine was first operated at that time?

A. Mr. Thieme, Mr. Whitelaw, myself, my brother, and, I believe, J. C. Moon.

Q. Where was the machine first operated?

A. At the Landis Machine Company shop, located at 25th and Mullanphy streets, St. Louis, Missouri.

Q. In what manner was the machine operated at that time?

A. To demonstrate its ability to add and also to transfer a number.

Q. Please explain how you transfer a number, and in your explanation please state what parts are operated and in what manner they control or affect other parts?

A. In the machine there are two sets of adding wheels, inde-

pendently operated by a single cam, and means for shifting the cam into operative relation with either of the two sets of accumulator wheels. To effect this shift of the operating cam a key is provided marked "R," which shifts the operating cam from one to the other position. In transferring a total from the forward to the rear totalizer, the total key for the forward accumulator is depressed and also "R" key, which shifts the operating cam into operative relation with the accumulator, then pulling the handle which actuates the actuating devices, causing the forward totalizer to be set at zero. Before the return movement of the actuator the rear totalizer is brought into operative relation with and on the return movement of the rack bars the number is transferred to the rear accumulator wheels. In transferring a number from the rear totalizers only the produce or "P" key for the rear totalizer is depressed, and the machine operated in the usual manner. This transfers the total from the rear to the forward totalizer.

Q. Was the machine operated to transfer a number from the front to the rear totalizer, and *vice versa,* in the manner described in your last answer, in December, 1903 ?

A. It was.

Q. Was that machine at that time provided with printing mechanism ?

A. It only had the type on it at that time, but the printing hammers were not. The parts for the hammer section were mostly made at that time.

Q. When were the printing hammers added to the machine ?

A. I think they were added during the early part of January, 1904.

Q. When was the typewriting mechanism added to the machine ?

A. According to my recollection, it was in the early part of February, 1904. I never kept any record of these matters, but speak from memory.

Q. Where is that machine now ?

A. It is here before me.

Q. Is the adding mechanism of that machine the same to-day as it was when you operated it in December, 1903?

A. It is.

·It should be remembered that the printing and typewriting mechanism are not here involved.

As to the conception and·successful operation of the adding mechanism, Hopkins is corroborated by the witnesses Thieme and W. W. Hopkins, who worked upon the construction of the machine, and Crawford and Moon, who were present and saw it operated. Thieme and W. W. Hopkins, as well as the inventor, were highly skilled in this art. They testified that at the December, 1903, trial of the adding mechanism of the machine, they operated it; and they fully explained in their testimony the manner in which it operated. One Sharp, the bookkeeper of the Landis Machine Company, produced the pay-roll, showing payments for work done on this machine beginning September 1, 1903. On the whole, we think this evidence is amply sufficient to establish both conception and reduction to practice. "To hold that this was not done would be arbitrarily to disregard and set at naught the testimony of witnesses whose character and reputation are unimpeached, and whose testimony is reasonable and in entire harmony with the circumstances of this case. We are unwilling to assume such a position." *Boynton* v. *Taggart,* 40 App. D. C. 82.

It appears that, after the completion of "Exhibit Machine No. 1" by the attachment of the typewriting mechanism in February, 1904, Hopkins immediately began the construction of another machine embodying the counts of the issue. It also contained the multiplying mechanism described in Hopkins's "Application No. 4," but not involved in this issue and not appearing in his "Application No. 1." This machine was completed in September, 1904, just before he filed his "Application No. 2." It also appears that Hopkins constructed five more machines containing the issue ·in ·interference between September, 1904, and the early part of 1906, · completing the last one about three months prior to the filing of his "Application No. 4."

The Board of Examiners-in-Chief, in its opinion, speaking of Hopkins's diligence and achievements up to September, 1904, the date of the completion of his second machine and the filing of his second application, said: "Certain it is that at no time during this period did Hopkins relinquish in any way his efforts to perfect his invention. During a portion of the time, his efforts were no less than prodigious. We marvel at the amount of work that this man and his associates accomplished between the first of March and end of September, 1904. The machine which he undertook to construct is not only complicated, but the inventive ideas involved therein are extremely ingenious, and their embodiment required the evolution of many details of construction and the greatest skill in workmanship."

No two of the tribunals of the Patent Office are in accord as to Hopkins's "Application No. 1." The Examiner of Interferences held that it disclosed an operative machine containing the issue of this interference, but held that Hopkins's testimony was insufficient as to the completion and test of "Exhibit Machine No. 1." He awarded priority to Hopkins on the ground that his first application was a constructive reduction to practice, and that it was executed prior to Dement's filing date, and therefore established conception in Hopkins as of the date of its execution. The Board of Examiners-in-Chief found that the device disclosed in "Application No. 1" is inoperative in six particulars, and therefore not a constructive reduction to practice, and that Hopkins's evidence is insufficient to establish when the "Exhibit Machine No. 1," was completed or tested. The Commissioner of Patents reversed the board as to certain of the features of inoperativeness, but held that there is no testimony establishing the date of completion of Hopkins's "Exhibit Machine No. 1," and that there is no testimony as to when said machine was successfully operated.

It is inconceivable upon what hypothesis the tribunals of the Patent Office ignored the conclusive proof as to the construction, completion, and successful operation of Hopkins's "Exhibit Machine No. 1." It will not do to discredit by wholesale the testimony on these crucial points of witnesses skilled in the

art, and, so far as the record discloses, entitled to the highest credit.

In *Seeberger* v. *Russel*, 26 App. D. C. 344, we held that, quoting from the syllabus, "Where the inventor, * * * and two witnesses who show themselves thoroughly familiar with its construction, testify fully as to the construction and operation of the device, and state that they used it a number of times and found it successful, a reduction to practice is sufficiently proved, and it is unnecessary that the facts on which they base their conclusion as to the successful working of the device should appear on the record."

It is sought to impeach the testimony of some of the witnesses by certain technical errors disclosed in their cross-examination as to the tests made on this "Exhibit Machine No. 1" in December, 1903. Hopkins's witnesses, however, stand unassailed in witnessing to the fact that work on this machine was begun about September 1, 1903, and that the machine was completed in February, 1904, in all particulars as it appeared in evidence, concededly containing the issue of this interference. Convinced that a successful test was made in December, 1903, we are little concerned with its exact nature or extent, since the machine was completed in the exact form in which it appeared in evidence. On this theory of the case, Hopkins had conceived the invention in issue, had reduced it to practice, and was busily engaged in pushing the machine to completion when Dement entered the field.

It is urged that Hopkins by filing his application here in interference abandoned his former applications. For the sake of argument, let us brush aside Hopkins's applications Nos. 1, 2, and 3, and we find him conceiving the invention in September, 1903, and between that date and January, 1906, completing in rapid succession seven machines, and within three months after the completion of the last of these seven machines, each of which contained the invention in issue, filing his "Application No. 4," here in interference. As suggested in the brief of counsel, there was not an unreasonable length of time elapsed between January 1, 1906, the date of the completion of the last

of the seven machines, and April 9, 1906, the date of filing his
fourth application.   The device is a most complicated one, in-
volving great inventive genius, and requiring a high degree of
skill to describe in detail its wonderful mechanism.   The fourth
application contained thirty-six sheets of drawings, seventy-five
typewritten pages of specifications, and four hundred and thir-
teen claims.   Hence, lack of diligence cannot be imputed to
Hopkins in filing this application, even if there had been no
actual reduction to practice, since he had been vigorously push-
ing his invention to a perfect completion from the date of con-
ception in September, 1903, to the date of filing his fourth ap-
plication.

But we think "Application No. 4" in no way signified an
abandonment by Hopkins of his former applications.   It was
intended as a general substitute for the former applications.
Referring to "Application No. 1," it is contended that it is
difficult to explain its failure to disclose the issue of the inter-
ference, if, as Hopkins claims, he had a machine containing it
at the date of filing the application.   It is stipulated that the
Patent Office drawings which accompanied the first application
were made between July and October, 1903, by one Dillon.   It
is not strange, therefore, if the application did differ in some
details from the machine in which the adding mechanism was
not completed for two months, and the machine itself was not
completed until four months, after the drawings were made.
It not infrequently occurs that, in a complicated mechanism
like this, the original application is incomplete and has to be
subjected to amendment.   A court, however, will not deprive
an inventor of the fruits of his invention upon fine-spun tech-
nicalities touching the inoperativeness of his device as disclosed
in the application, when it conclusively appears that at the time
of filing the application he had a machine showing the inven-
tion.

Finding, as we must, that Hopkins has conclusively proved
conception of the invention of the issue not later than Septem-
ber, 1903, the operativeness or inoperativeness of the device dis-
closed in "Application No. 1" becomes unimportant, since, on

any angle from which we view the case, his right to priority is legally established.

The case of *Peters* v. *Hopkins,* 34 App. D. C. 141, can be disposed of very briefly. The earliest date of conception claimed by Peters is about January 1, 1904. Hopkins antedates this by several months, and, as we have held in the former case, diligently reduced his invention to practice. He must therefore be adjudged entitled to the award of priority.

The decision of the Commissioner in cases No. 869 and No. 871 is reversed, and the decision in case No. 872 is affirmed. The clerk is directed to certify these proceedings as by law required.    Nos. 869 and 871 *Reversed,* and No. 872 *Affirmed.*

A petition for a rehearing was overruled February 2, 1914.