56 CCPA

Samuel S. KISTLER, Appellant,

v.

Neill WEBER, Appellee.

Patent Appeal No. 8169.

United States Court of Customs
and Patent Appeals.

June 26, 1969.

Rehearing Denied Sept. 18, 1969.

Stowell & Stowell, Washington, D. C., attorneys of record, for appellant. Harold T. Stowell, Albert Tockman, A. Donald Messenheimer, Washington, D. C., of counsel.

Chisholm & Spencer, Pittsburgh, Pa., for appellee. Oscar L. Spencer, William S. Britt, Pittsburgh, Pa., Conrad Christel, Buffalo, N. Y., George R. Jones, Arlington, Va., of counsel.

Before RICH, Acting Chief Judge, HOLTZOFF and McLAUGHLIN, Judges, sitting by designation, and ALMOND and BALDWIN, Judges.

RICH, Acting Chief Judge.

This appeal is from the decision of the Board of Patent Interferences awarding priority to Weber in interference No. 95,538, involving Weber patent No. 3,218,220, for "Strengthened Glass Article And Method Of Producing Same," issued November 16, 1965, on application serial No. 412,658, filed November 20, 1964, and Kistler application serial No. 435,683, filed February 26, 1965, for "Treatment of Glass."

### The Invention of the Count

The invention is a method of tempering or strengthening soda glass which involves contacting the glass with a molten potassium salt at a temperature below the strain point of the glass to effect replacement of sodium ions present in the surface layer of the glass with potassium ions from the salt. The replacement can be effected by ordinary diffusion or by diffusion biased by an electrical field.

Because potassium ions are much larger than sodium ions, the replacement of the latter with the former causes a compressive stress in the surface layer and a concomitant, over-all strengthening of the glass. The single count in interference, claim 5 of the Weber patent, reads:

1. A method of tempering soda glass comprising replacing sodium ions in a surface layer of the glass by potassium ions by contacting the glass with a molten potassium salt while retaining the glass *below the strain temperature thereof* to place the surface in compression. [Emphasis ours.]

### Proceedings Below

Weber filed his first application, serial No. 13,777, on March 9, 1960, and a continuation-in-part ("c.i.p.") thereof on November 20, 1964. On November 16, 1965, the c.i.p. issued as the Weber patent involved here.

Kistler filed his first application, serial No. 69,251, on November 15, 1960 (about eight months after the filing of the Weber parent application) and filed the instant c.i.p. on February 26, 1965. Claims copied from the Weber patent were added to the c.i.p. on March 9, 1966 (about four months after the patent issued), for the purpose of provoking this interference.[1] Kistler took the position that Weber was not entitled to the benefit of the filing date of his parent application (for reasons discussed hereinafter), that his (Kistler's) effective filing date was therefore senior to that of Weber so that no showing under Rule 204(c)[2] was required of him (Kistler). Notwithstanding Kistler's.

---

1. In his brief Kistler *asserts:*

The case arises out of the Patent Office practice in prospective interferences between pending applications to issue the senior application, leaving it to the junior applicant to copy claims from the issued patent as a first step toward initiating the interference. And, by way of a footnote, Kistler comments:

The Commissioner has ordered that "except under exceptional circumstances" interferences shall not be declared between applications having more than six months' difference in their effective filing dates. This practice is followed even though interfering subject matter is noted while the applications are pending. MPEP 1101.01(g) (Rev. 5, July, 1965) The invalidity of the practice is obvious in light of the *mandatory* language of the statute which provides that the Commissioner "shall give notice" of such interfering subject matter to the applicants and that "the question of priority shall be determined by a board of patent interferences." 35 U.S.C. § 135(a). There is no basis for the Commissioner's issuing a patent to the first applicant and then, contrary to the statutory mandate, putting the second applicant under the burdens of Rules 204(c) and 228. The obvious invalidity of this practice is further emphasized when these Rules are construed in derogation of the *statutory* rights of the junior party. It is, of course, difficult to detect with certainty when this practice has been applied. [Emphasis quoted.]

2. Rule 204(c) reads as follows:

204. *Interference with a patent; affidavit by junior applicant.*

\* \* \* \* \*

(c) When the effective filing date of an applicant is more than three months subsequent to the effective filing date of the patentee, the applicant, before the interference will be declared, shall file two copies of affidavits by himself and by one or more *corroborating* witnesses, supported by documentary evidence if available, setting out a *factual description of acts and circumstances* which would prima facie entitle him to an award of priority relative to the effective filing date of the patentee, and accompanied by an explanation of the basis on which he believes that the *facts* set forth would overcome the effective filing date of the patentee. Upon a showing of sufficient cause, an affidavit on information and belief as to the expected testimony of a witness whose testimony is necessary to overcome the filing date of the patentee may be accepted in lieu of an affidavit by such witness. If the examiner finds the case to be otherwise in condition for the declaration of an interference he will consider this material only to the extent of determining whether a date prior to the effective filing date of the patentee is alleged, and if so, the interference will be declared. [Emphasis ours.]

position with respect to the necessity of his doing so, he submitted "a showing considered to meet the requirements of Rule 204 * * * in order to expedite declaration of the interference."

Although the examiner initially held that an adequate showing under Rule 204(c) had not been made,[3] the application was eventually forwarded to the board, and this interference was declared.

The declaration of interference accorded each party the benefit of the filing date of his parent application; as a result, Weber was made senior party. Mailed with the declaration of interference was an Order to Show Cause listing deficiencies that the board found in Kistler's Rule 204(c) showing and indicating that unless Kistler showed cause why such action should not be taken, summary judgment would be entered against him, all in accordance with Rule 228.[4] Kistler filed a response to the show cause order (as permitted by Rule 228) together with an amplified affidavit of Kistler. In the response, Kistler again challenged Weber's entitlement to the filing date of his parent application and Weber's senior party status, and maintained that his amplified Rule 204(c) showing was sufficient prima facie to entitle him to an award of priority relative to the filing date of Weber's parent application. As permit-ted by Rule 228, Weber presented his views on both of Kistler's contentions. An oral hearing on the Order to Show Cause was had before the board, and its decision granting summary judgment against Kistler is the subject of this appeal.

### Weber's Right to Rely on His Parent Application

The arguments with respect to Weber's right to rely on the filing date of his parent application revolve about the following two sentences therein:

The rate of exchange of potassium ions for sodium ions by ordinary diffusion at temperatures below the strain point of the soda glass, such as takes place when a soda glass article is immersed in a molten potassium salt is *impractically slow.* On the other hand, it has been found that the rate of migration of potassium ions into the soda glass can be vastly increased if the diffusion is biased *by an electric field in the proper direction.* [Emphasis ours.]

Kistler argues that this disclosure teaches that the exchange of potassium ions for sodium ions in the absence of an electrical field is "inoperative" and "lacks utility" and from this argues that:

Weber cannot now retreat from his earlier admission against interest and

---

3. Compare In re Dickinson, 49 CCPA 951, 299 F.2d 954, (1962). Also, see the last sentence of Rule 204(c), supra note 2.

4. Rule 228 reads:

228. *Summary judgment.* When an interference is declared on the basis of a showing under rule 204(c), such showing will be examined by a Board of Patent Interferences. If the Board considers that the facts set out in the showing provide sufficient basis for overcoming the effective filing date of the patentee, the interference will proceed in the normal manner as provided by the rules in this part; otherwise an order shall be entered concurrently with the notice of interference pointing out wherein the showing is insufficient and notifying the applicant making such showing that summary judgment will be rendered against him because of such insufficiency at the expiration of a period specified in the notice, not less than thirty days, unless cause be shown why such action should not be taken. Any response made during the specified period will be considered by the Board without an oral hearing unless such hearing is requested by the applicant, but additional affidavits or exhibits will not be considered unless accompanied by a showing justifying their omission from the original showing. If the applicant files a response to the order to show cause, the patentee will be furnished with one of the copies of the showing under rule 204 (c) and will be allowed 30 days from its mailing date within which to present his views ,with respect thereto. He shall also be entitled to be represented at any oral hearing on the matter.

rely on the negative disclosure of his 1960 application as supporting the subject matter of the count or as constituting constructive reduction to practice of the invention of the count.

Weber replies as follows:

By stating that ion diffusion unaided by current was "impractically slow", Weber was saying, in effect, that the preferred manner of carrying out the invention was with a molten salt in the presence of an imposed electrical field.

\* \* \* \* \* \*

\* \* \* Weber cautions that diffusion alone may be quite slow, but does not state that strengthening will not take place in the absence of applied current. The import of Weber's statement is only that in preferring use of electrical fields, Weber can hasten the desired exchange at the relatively low temperatures required to remain below the strain point.

Holding for appellee, the board had this to say:

Kistler argues, on the basis of this statement, that Weber considered his process inoperative except as biased by an electric field, and that Weber was therefore *not entitled in that application to make a claim broad enough to include exchange "by ordinary diffusion."* In considering this argument we have noted:

1. That there is no difference between the 1960 and 1964 applications in regard to the sentence in question, and that Kistler's attack is hence, in effect, an attack upon Weber's right to make the count in his patent.

2. That the count language is readable, word for word, on the Weber 1960 application (Compare Kyrides

v. Andersen, 28 CCPA 1336 [121 F.2d 514, 50 USPQ 131], 1941 C.D. 720).

3. That Weber considered, as reflected in claim 1 of his 1960 application,[5] that his invention included both electrolytic and non-electrolytic processes.

We therefore disagree with Kistler's position, and we have no doubt that Weber's 1960 application supports \* \* \* the present \* \* \* count and we so hold. [Emphasis ours.]

After careful consideration of all the arguments raised on this issue, we do not share appellant's view as to what the disclosure in question would teach one of ordinary skill in the art. It unquestionably teaches both embodiments of the process of the count and, in our opinion, does not teach that the process of the count is, in the sense of the patent law, either inoperative or lacking in utility when carried out in the absence of an electrical field. Important property rights should not depend merely on a felicitous choice of words. We therefore agree with the board that Weber's parent application supports the count and that Weber is entitled to the benefit of its filing date.

### Adequacy of Kistler's Rule 204(c) Showing

At the outset, we will consider Kistler's contention that the board applied too strict a standard in judging whether he has made a prima facie case of priority. Citing Peters v. Hopkins, 34 App.D.C. 141, 1910 C.D. 278 (1909), Kistler contends that he is entitled to a "full hearing on priority" if his Rule 204(c) showing "gives rise to any reasonable inference that he can establish priority." In *Peters,* decided under old Rule 114,[6]

---

5. Claim 1 in that application reads:
   1. A method of tempering soda glass comprising the steps replacing sodium ions in a surface layer of the glass by potassium ions and retaining the glass below the strain temperature thereof to place the surface in compression.

6. Old Rule 114 read, in pertinent part, as follows:
   If the junior party to an interference, or if any party thereto other than the senior party, fail to file *a statement,* or if his statement fail to overcome the prima facie case made by the respective dates of application, such party

junior party Peters had filed a Preliminary Statement alleging conception of the invention in issue on January 1, 1904, eight days prior to the filing date of senior party Dement.[7] Because Peters did not also allege a *disclosure to another* prior to Dement's filing date, the Examiner of Interferences entered summary judgment against him. An appeal was taken by Peters to the Commissioner, who affirmed the decision, saying (as quoted in the court's opinion):

> Experience has shown that it is only in rare cases, if ever, that conception is proved except by disclosure to others, either orally or by means of some tangible evidence; and it is believed, therefore, that in those cases where a junior party alleges the fact of conception only, prior to the filing date of the senior party, the better practice is to issue an order to show cause against the junior party. If the case is one of those conceivable, but exceedingly rare, cases, where conception can be established by means other than disclosure, and the party against whom the order to show cause has been issued shall, within the time set therein, file the affidavit of himself or of his attorney, setting forth that it is proposed to establish conception by means other than disclosure, the Examiner of Interferences will not render a judgment, but will set times for taking testimony. This practice will work no hardship upon the junior party, for the rule permits him to

bring all valid motions after the order is issued to show cause why judgment should not be rendered.

After observing that it was possible that Peters could corroborate his conception other than by proving *disclosure* to another,[8] the court said:

> * * * bearing in mind that the one first to conceive an invention is, under reasonable conditions, the particular object of the bounty of the law authorizing the granting of patents, we are of the opinion that the ruling of the Commissioner in this case is too strict a construction of rule 114. A rule providing for a summary judgment, by preventing a party from having a regular trial of his cause, should be liberally construed. The rule of the Patent Office is analogous to the rule of the court, which authorizes a summary judgment against a defendant in an action for debt, supported by affidavit, unless he shall file a sufficient affidavit of defense. In the enforcement of that rule it has been said that the truth of the facts in the affidavit must be assumed to be true, and that if the facts, by any reasonable or fair construction, will constitute a defense to the claim of the plaintiff, within the scope of the pleadings, it is the right of the party to have his case regularly tried in due course of judicial investigation.

Kistler contends that *Peters* stands for the proposition that "even if priority is *probably* not provable, the junior party nevertheless has a right to a trial on

---

shall be notified by the examiner of interferences that judgment upon the record will be entered against him at the expiration of a time fixed by the examiner of interferences, not less than thirty days, unless cause be shown why such action should not be taken * * *.

7. Notwithstanding the title of this case, it was a three-party interference in which Dement was the most senior party. He filed Jan. 9, 1904, and Peters filed April 14, 1905. See the sequel, Hopkins v. Peters and Dement, Etc., 41 App.D.C. 302, 1914 C.D. 116.

8. Thus, the court said:
For example: An inventor might write a complete description of his invention, and deposit the same in a sealed packet, with another person, for safekeeping, without making any disclosure of the contents. The production of the packet, with proof of the date of the receipt, would be sufficient evidence of the existence of the conception on that date. Other conditions more or less probable might be imagined.

the question of priority if the dates he alleges might *conceivably* be established." (Emphasis quoted.) Continuing, Kistler says:

> Although the *Peters* case was decided under old Rule 114, the parallel to a Rule 228 proceeding is apparent. Both provide for:
>
> a. summary judgment (or in the language of Rule 114, "judgment on the record");
>
> b. following an order to show cause;
>
> c. predicated on the alleged insufficiency of the *initial* showing made by the junior party;
>
> d. *after* declaration of the interference. In addition, the legal effect of both proceedings is identical—an award of priority to the senior party without a trial on the merits. There is, therefore, no reason to believe that the standards set forth in *Peters* should not be equally controlling.
> [Emphasis quoted.]

█ We do not agree that *Peters* is controlling here because there is one singularly important difference between the requirements of old Rule 114 and present Rule 204(c). The former only called upon the junior party in the *pleading,* called a Preliminary Statement, to *allege* facts which, if subsequently proved, would overcome the prima facie case made by the date of the senior party's application, whereas the latter calls upon the junior party to *prove* (by way of affidavit(s) setting forth facts) at least so much of his case as would entitle him to an award of priority *if* the senior party were to rely only on his filing date and were not to rebut any of the junior party's case. Under old Rule 114, it was to be assumed that the junior party could prove what he alleged in his Preliminary Statement; he was not required to prove anything. Under Rule 204(c), however, prima facie *proof* of facts is called for, albeit in affidavit form.

█ We also disagree with Kistler's suggestion that Rules 204(c) and 228 place any undue burden on a junior party or are inherently in any way "contrary to the statutory rights of a first inventor." The expense involved in a protracted interference, and the special hardships workable on a patentee involved therein,[9] are notorious, and to minimize both, where possible, would appear to be the laudable purpose of these rules. If a junior party is in fact "a first inventor" and if he could prove that in a "full hearing on priority," we see no reason why he should be prejudiced or unduly burdened by a requirement that he prove (prior to a "full hearing") by way of affidavits and documentary evidence that he is at least prima facie entitled to an award of priority over the patentee's effective filing date.

We now turn to a consideration of Kistler's showing under Rule 204(c), which consists of twenty-nine documentary exhibits and five affidavits, one by Kistler and one each by Baer, Ryan, and Christiansen, three members of the Department of Chemical Engineering of the University of Utah where Kistler's work was conducted, and one by Christensen, the Coordinator of Cooperative Research at the university. Kistler's affidavit provides the following narrative description of his alleged conception and reduction to practice of the process of the count (emphasis ours):

> Conception of the invention is found in my Research Proposal to the National Science Foundation, dated March 26, 1958, and witnessed by Drs. Christensen and Christiansen (Exhibit 1). Note particularly the first full paragraph on page 4 which reads as follows:
>
> "One treatment that appeals to us as probably rewarding involves placing

---

9. The incidence of patentee involvement in interferences is of course increased by the practice described in footnote 1. But the wisdom of that practice is not for us to question. For a commentary on the practice, see M. Crews, "Interference Practice and the New Rules," 48 J.Pat.Off.Soc'y 411, 414–420.

the surface layers under compression, possibly only to a depth of two or three hundred Angstrom units. This can probably be done in several ways but one suggestion is to draw the glass rod with a platinum wire down its center. This rod would then be immersed in a fused salt of potassium, rubidium, cesium, silver, etc. By making the bath positive and the platinum wire negative, metallic ions can be driven into the surface of the glass, replacing sodium ions which would migrate toward the wire, and since these substitute ions have larger volumes than the sodium ions, the glass surface can be put under an optionally large compression. Possibly this same effect can be achieved by diffusion of ions from a melt or even from solution without the aid of an electric current. Aqueous solutions probably would not be usable because of the hydrolytic attack on the glass. A number of nonaqueous solvents are good ionizers of salts. A secondary study associated with the main objective would be interferometric or stress-optical determination of the expansion of the surface due to replacement of smaller ions by larger ones."

Conception of the invention is also shown in my Research Proposal to the Owen-Illinois Technical Center, dated September 15, 1959 (Exhibit 2). The most pertinent portion appears at page 6 and reads as follows:

"SURFACE TREATMENT TO PUT THE SURFACE UNDER COMPRESSION: * * * It has been demonstrated that when a piece of soda-lime glass is heated in a melt of potassium, silver, lithium, or ammonium salts an exchange occurs between Na + ions in the glass and the cations in the melt. Since melt ions of various sizes can be used, it should be possible to produce compression in the surface layer of the glass by the use of potassium ion, for example, and tension in this layer by the use of lithium."

This proposal was also witnessed by Drs. Christiansen and Christensen; their affidavits are of record.

After receipt of an NSF grant and during December of 1959, I ordered supplies and equipment, such as an electric furnace and controls, vacuum pump, glass cover slips, and various chemicals for the project (Exhibits 3–5). Note the designation "Strength and Failure of Glass" after "Charge to" on the requisitions. I also requested and had been supplied a partial analysis of the 0211 glass cover slips by the manufacturer (Exhibit 6).

The work described in my laboratory notebook (Exhibit 7) was done by me at the College of Engineering at the University of Utah at Salt Lake City, Utah. The work described was entered in the notebook as it was done on the indicated dates.

The entries in the period February 3–8, 1960 (pages 1–4) describe various preliminary experiments with cover slips I knew to contain both sodium and potassium. Note the last two sentences of the February 8 entry which describes placing a curved cover slip onto a glass slide, seeing interference rings and making the observation that it was a good method of measuring curvature.

Actual reduction to practice is described in the entries dated February 9–11, 1960 (pages 5–7). On February 9, I placed a curved cover slip, concave side up and with potassium nitrate on it, into an electric furnace at 350°C. This temperature was below the strain point of the cover glass and above the melting point of potassium nitrate. On the morning of February 10, I observed that the glass cover slip was rather strongly concave down due to compression resulting from replacement of sodium ions with potassium ions. Similar experiments were performed February 10 and similar results were observed that day and on February 11.

Repeated reductions to practice were accomplished in a similar manner dur-

ing the period March 3–8, 1960 (pages 15–24). The radius of curvature of several exchanged cover slips were determined graphically employing the calculations shown in the entries dated February 29, 1960 and March 2, 1960. The radius of curvature determination was based on interference ring distance measurements.

During the period March 17–19, 1960 (pages 37 and 38) I again reduced my invention to practice, and determined the radius of curvature and the compressive force ($F_R$) in the surface layer.

Drs. Christensen, Ryan and Baer were familiar with the details of my "Strength and Failure of Glass" project. They observed my equipment and the bottles of chemical reagents employed, my notebook and the diffraction or interference rings present in the treated cover slips during this period as set forth in their affidavits.

I diligently continued working on the project and prepared a patent disclosure entitled "Increasing Strength of Glass by Diffusing Large Ions into the Surface" (Exhibit 8). I also prepared a memorandum dated July 19, 1960 supplementing my disclosure (Exhibit 12). To the best of my knowledge and belief, my disclosure and memorandum were forwarded in July of 1960 to the Research Corporation by Dr. Christiansen, Coordinator of Cooperative Research at the University of Utah. I wrote a letter to Mr. Yates of Research Corporation discussing my work on August 5, 1960 (Exhibit 15), and letters to Mr. Stowell their patent attorney containing further data on September 19, 1960 (Exhibit 23) and informing him that no further data would be available in the immediate future on October 14, 1960 (Exhibit 25). The completed application was sent to me for execution by letter dated October 25, 1960 (Exhibit 26) and for notarization of my signature by letter dated November 3, 1960 (Exhibit 28). The application was filed in the Patent Office on November 15, 1960.

The relevant substance of each of the affidavits of Baer, Ryan and Christiansen consists of the following averments, made as of March 1966:

THAT he knows and has been associated professionally in the Department of Chemical Engineering of the University of Utah with Samuel S. Kistler, applicant in the above-identified application, and is familiar with Kistler's work on the strengthening of glass;

THAT in 1959 and 1960 Kistler performed his experiments on the strengthening of glass in a room frequented by various members of the Department of Chemical Engineering and that bottles of chemical reagents, the furnace, the microscope, and the notebook used by Kistler were readily apparent;

THAT on various occasions, sometime about January or February, 1960, he observed Kistler treating glass cover slips and that he viewed under the microscope glass cover slips curved by Kistler's treatment and observed circular diffraction rings in the curved glass slips.

Christiansen also averred:

THAT he is the E. B. Christiansen who signed Kistler's research proposals to the National Science Foundation and to the Owens-Illinois Technical Center dated March 26, 1958 and September 18, 1959, respectively.

The Christensen affidavit reads in part:

THAT since 1946 he has been associated with the University of Utah and that he knows Samuel S. Kistler, applicant in the above-identified application, and is familiar with Kistler's work in the strengthening of glass; and

THAT he is the Carl J. Christensen, Co-ordinator of Cooperative Research, who signed Kistler's research proposals to the National Science Foundation and to the Owens-Illinois Technical Center dated March 26, 1958 and September 18, 1959, respectively.

With respect to the adequacy of Kistler's affidavits and exhibits, the entirety of the board's opinion reads:

> We agree with Weber's position that Kistler's showing is fatally inadequate, at least from the standpoint of corroboration and testing, as it does not appear from Kistler's own testimony that he subjected the product of his process to tests, or from the corroborating affidavits that his supporting witnesses had knowledge adequate to supply vitally necessary corroboration as to reduction to practice or diligence.

We agree with the board's conclusion. It is clear from the above quotations that none of the so-called corroborating witness affidavits makes any reference to even one of the process limitations of the count. As the appellee said to the board, "The probative significance of these averments is nil * * *." Nothing is left except the averments of the inventor himself and his own notebook. Examination of the notebook shows that it was kept by Kistler himself and is unwitnessed. The supporting witnesses said no more, in effect, than that they had seen the notebook in his laboratories, along with the equipment and bottles. They did not say they knew anything of its contents. Therefore, they have not corroborated anything it contains.

Consideration of Kistler's Supplemental Brief shows that his theory of this case is that he does not have to *prove* his facts at this stage of the interference but only give rise to an *inference* or show a *possibility* that he could prove them later, which he says should suffice to prevent summary judgment:

> * * * Appellant should be entitled to a *trial on the merits*. For now, it is sufficient that we can say when considering the purpose for which the affidavits were made, that there is a reasonable *possibility* that the corroborating affiants *possessed* the knowledge required. [Emphasis ours.]
>
> * * * * * *
>
> Moreover, a determination of whether or not the corroborating affiants had acutal knowledge of the steps of the process or of testing is premature; such a determination bears only upon the weight to be given their subsequent testimony.

We cannot accept this procedural theory. To do so would entirely vitiate the purposes of Rules 204(c) and 228 and allow mere uncorroborated assertions to take the place of proof of acts and circumstances adequate to overcome Weber's March 9, 1960, filing date.

The decision of the board is affirmed.

Affirmed