Felix F. MIKUS and Francis N. Shaffer, Appellants,

v.

Anselm WACHTEL, Appellee.

Patent Appeal No. 76–594.

United States Court of Customs and Patent Appeals.

Oct. 28, 1976.

James Theodosopoulos, Ipswich, Mass., attorney of record, for appellants.

William D. Palmer, Pittsburgh, Pa., attorney of record, for appellee.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

MARKEY, Chief Judge.

This appeal is from the decision of the Board of Patent Interferences awarding priority of invention to Wachtel. We affirm.

This appeal follows from a remand to the board [1] to consider appellants' (Mikus') Exhibit BH, a "Record of Invention," in light of our opinion in *Blicharz v. Hays*, 496 F.2d 603 (Cust. & Pat.App.1974).

Upon remand, the board majority adhered to its award of priority to Wachtel, finding that the "Record of Invention," *inter alia*, failed to provide Mikus with corroboration of reduction to practice.

The interference involves the application of Mikus et al. serial No. 709,213, filed February 29, 1968, entitled "Divalent Europium Activated Alkaline Earth Halophosphate Phosphor" and the application of Wachtel, serial No. 726,464, filed May 3, 1968, entitled "Alkaline-Earth Metal Halophosphate Luminescent Composition Activated by Divalent Europium." The subject matter at issue, embodied in a single count, is a phosphor composition which finds utility in its property of fluorescence. When excited with ultraviolet or cathode ray radiation, the phosphor emits light having a range of wavelengths in the blue area of the visible spectrum.

The sole count reads:

A luminescent composition consisting essentially of a matrix of halophosphate of alkaline-earth metal, wherein the alkaline-earth metal is calcium, barium, and/or strontium, the halogen is chlorine and/or bromine, and an activating proportion of divalent europium.

### Priority Proofs and Board Opinion

The parties relied upon stipulated testimony and documentary exhibits. Mikus' priority proof centers around the testimony of co-inventor Shaffer and his Technical Notebook. Shaffer testified that he prepared several compositions embraced by the count and recorded these compositions in his notebook. Each page of the notebook is signed and dated by Shaffer, but no page is witnessed. The pages presented do not follow a numerical sequence and numerous intervening pages are missing. Mikus says the missing material related to non-relevant

work. Material from one page is occasionally continued on a much later page rather than on the next succeeding page, e. g., material from page 77 is continued on page 84, material from page 79 is continued on page 82.

Shaffer testified that he identified the compositions with lot numbers and gave these compositions, so identified, to technician Persun for testing. Persun testified that he performed Spectral Emission Distribution (SED) tests on these compositions and recorded the results on slips of paper which he returned to Shaffer. Persun also recorded the results in his own notebook. Persun did not sign his notebook but he did sign graphs made in the tests. The compositions are identified in these test results by lot numbers. Shaffer stapled the test results into his notebook. Shaffer also transmitted several composition samples to another technician, Kring, for X-ray diffraction testing. Kring performed the tests, recorded the results in his notebook, and initialed the pages.

Subsequently, Shaffer prepared a "Record of Invention" including a description of the composition on which he had worked and incorporating the test results of Persun and Kring. This "Record of Invention" was signed by inventors Shaffer and Mikus and witnessed by two others who testified to having read and understood the document. Some two years later the subject patent application was filed. The application contains tables and examples substantially the same as those in the "Record of Invention."

Mikus urges that an application of the "rule of reason" to the record as a whole—particularly to the consistency among Shaffer's notebook, the test results, the "Record of Invention," and the patent application—will establish adequate corroboration of actual reduction to practice. Wachtel, on the other hand, points out that no one, other than co-inventor Shaffer, witnessed a reduction to practice of a phosphor within the scope of the count, that the documentary

1. *Mikus v. Wachtel*, 504 F.2d 1150 (Cust. & Pat.App.1974). We agreed with the board re-

garding appellee's actual reduction to practice of a species embraced by the count.

proof adduced by Mikus is based entirely upon self-serving statements by co-inventor Shaffer, and that inconsistencies exist in Mikus' proof.

The board found insufficient corroborative evidence of an actual reduction to practice by Mikus. The "Record of Invention" and the test results were deemed based upon documents either actually prepared by one of the inventors or on facts furnished by one of the inventors. In a dissenting opinion, one board member expressed the view that the record indicates Shaffer could not have "fabricated or falsified" the proofs and, indeed, would have little to gain from doing so as the invention was assigned to his employer. The dissenting member reasoned that because the rule for corroboration exists to protect against such fabrication or falsification, the notebook, Record of Invention, and the patent application, all being consistent, provide adequate corroboration.

## OPINION

In the prior appeal we agreed with the board's finding of reduction to practice by Wachtel, based upon a species reduction on August 14, 1967. Wachtel, as junior party, has thus borne his burden of proof. The burden now rests on Mikus to antedate Wachtel's priority date.

■ The objective sought in requiring independent corroboration of reduction to practice of a chemical composition invention is to insure that the inventor actually prepared the composition and knew it would work. *Gianladis v. Kass*, 51 CCPA 753, 324 F.2d 322 (1963). The standard is not inflexible and is not to be applied mechanically. Hence, a "rule of reason" approach is required. *Linkow v. Linkow*, 517 F.2d 1370 (Cust. & Pat.App.1975); *Anderson v. Pieper*, 58 CCPA 1221, 442 F.2d 982 (1971); *Berry v. Webb*, 56 CCPA 1272, 412 F.2d 261 (1969). Though each and every element of

the count must be corroborated, there is no single, fixed corroboration formula. Documentary evidence and the activities of others may be corroborative. *Phillips v. Carlson*, 47 CCPA 1007, 278 F.2d 732 (1960). We have held that a "Record of Invention" and patent application, containing examples substantially identical to examples reported in an unsigned and unwitnessed inventor's notebook, and the testimony of a witness who was in a position to have observed the experiments first hand, provided significant corroborative evidence of an actual reduction to practice. *Blicharz v. Hays*, 496 F.2d 603 (Cust. & Pat.App.1974).

In a number of prior cases it was found significant that a witness, other than one of the inventors, testified to having some first-hand knowledge of the experiments.[2] In other cases this court has found sufficient corroboration of a specific property *e. g.*, deceased person's notebook, properly authenticated to show that the production products were solid, *Anderson v. Pieper*, 58 CCPA 1221, 442 F.2d 982 (1971); test results showing that the material was stable and therefore had utility, *Richardson v. Cook*, 58 CCPA 1274, 442 F.2d 1398 (1971); test results indicating that the product produced was an organic photoconductor which corroborated utility, *Mattor v. Coolegem*, 530 F.2d 1391 (Cust. & Pat.App.1976).

■ In the case before us, no independent witness was produced who could testify to having first-hand knowledge of the composition's production, and it is not merely a property of the compound but the actual composition of the compound itself that is being questioned herein. Testimony of one who witnessed and understood the actual reduction to practice of a composition is strong evidence. It's absence need not be fatal, however, when other evidence is sufficient to corroborate such actual reduction to practice. In the present case, Mikus relies on such "other" evidence.

2. Witness observed the experiments, *Berry v. Webb*, 56 CCPA 1272, 412 F.2d 261 (1969); witness performed experimental work using the inventor's notebook, *Beeber v. Krogh*, 56

CCPA 880, 403 F.2d 743 (1968); witness observed the result of an experiment where the change was a simple process change, *Patterson v. Hauck*, 52 CCPA 987, 341 F.2d 131 (1965).

█ Mikus contends: that SED tests by Persun corroborate the presence of divalent europium in the sample composition; that it is generally known that firing trivalent europium in a reducing atmosphere reduces it to divalent europium; and that Kring's X-ray diffraction analysis corroborates the halophosphate matrix structure of the sample composition. That the results from the SED and X-ray diffraction tests on samples FS103–195A, B and C, FS103–197D, E and FS2–45, 47 appear consistently on papers stapled to the inventor's notebook, in the laboratory notebooks of Persun and Kring, in the Record of Invention, and in the patent application is said to compel the conclusion that the composition of the count was actually reduced to practice.

We have reviewed Mikus' priority proofs and fail to find the necessary corroboration. The "consistency" emphasized by Mikus, upon careful analysis, is not clearly established on the record.

Each of the lots FS103–195A, –195B, and –195C is identified on page 77 of Shaffer's notebook as containing four compounds. The notebook indicates that these compounds were blended, fired, and second step fired in a reducing atmosphere. A suffix H1 was then applied to the lot numbers. The notebook goes on to indicate, on page 84, that portions of these lots were prepared in a different fashion and labelled with the suffix H2. Persun testified that Shaffer gave him six phosphor samples which included samples identified as FS103–195A, –195B, and –195C. Persun ran SED tests on these samples and recorded the results on a slip of paper which he dated but did not sign and which he returned to Shaffer. Shaffer stapled the slip in his notebook. Persun additionally recorded the results in his own notebook which he also did not sign. Both the slip of paper returned to Shaffer and Persun's notebook entry refer to the samples tested as FS103–195A, –195B and –195C, with no suffix.

It would appear, therefore, that the steps which resulted in the compounds being labelled H1 or H2 had not been performed on the compounds tested by Persun.

Mikus says that divalent europium emits in the blue region of the visible spectrum, while trivalent europium emits in the red region, and that firing in a reducing atmosphere necessarily reduces trivalent europium to divalent europium. Shaffer's notebook specifically calls for the fired composition to have either an H1 or H2 suffix, yet the sample identifications in the testimony of both Shaffer and Persun, and those set forth in the test results, do not contain such a suffix. Lack of a suffix cannot be presumed a simple oversight when other compositions tested by Persun specifically include a suffix denoting firing.

Furthermore, Persun's SED tests would have indicated only the presence of europium—not the halophosphate matrix of the count, which could only have been established by X-ray diffraction analysis. According to the stipulated testimony of record, Kring did not perform such an analysis on samples FS103–195A, –195B, and –195C. In this regard we note that the patent application refers to these compositions as "*Theoretical* Fired Composition[s]" (emphasis added).

Shaffer's notebook indicates that samples identified as lots FS2–45 and FS2–47 were identified by the suffix –1 after first step firing and –1H1 for second step firing under one set of conditions and –1H2 for second step firing under another set of conditions. Persun testified that he received samples identified as FS2–45–1 and FS2–47–1 and performed SED tests on these samples. As before, the identification of the samples testified to by Persun tends to indicate that they were not second step fired. Technician Kring testified that he received, through his supervisor, samples identified as FS2–45–1H1 and FS2–47–1H1 for X-ray diffraction testing which he performed. These tests, however, were conducted five days *after* the date on which the Record of Invention was purportedly signed. These diffraction tests were not referred to in the Record of Invention or in the patent application. Thus, the evidence of record fails to clearly establish that the composition identified in Shaffer's notebook

and tested by Persun was the same composition tested by Kring.

Samples identified as FS103–197DH2 and FS103–197EH2 are recorded in Shaffer's notebook, wherein Shaffer states that the suffix H2 was given these compositions after they had been second step fired in a reducing atmosphere. Technician Kring testified that he was given samples marked FS103–197DH2 and FS103–197EH2 by his supervisor for X-ray diffraction testing. The results of these tests were recorded in his notebook and initialed by himself and his supervisor. These results appear in table form in both the Record of Invention and the patent application. Exhibit BJ, a letter from Shaffer to Hoffman, Kring's supervisor, specifies the components and amounts thereof Shaffer used in preparing these two samples. This same information is said to appear in both the Record of Invention and the patent application. We have examined both the Record of Invention and the patent application and note that the material therein is substantially consistent with Shaffer's letter, except that the letter does not specify the amount of $Eu_2O_3$ as does the Record of Invention and the patent application. Though it is alleged that the preparation of these samples appears on page 80 of Shaffer's notebook, there is no clear correlation between the formulations in the notebook and those in Shaffer's letter. There is no indication of $Eu_2O_3$ quantity in Shaffer's notebook. As to this composition, Persun testified that he received compositions identified as FS103–197D and –197E on which he performed SED tests. The results of these tests appear consistently in Shaffer's notebook, Persun's notebook, the Record of Invention, and the patent application. As noted above, however, the samples which were second step fired were marked by Shaffer with the suffix H2, and that suffix does not appear in Persun's testimony or in his test reports.

In summary, Persun knew only that he was to test samples identified by lot numbers and supplied to him by Shaffer. He had no direct knowledge of the composition of these samples and there is no evidence to indicate that Shaffer or anyone else told him the composition. Persun performed SED tests on these samples and recorded the results using the identification code furnished him by Shaffer. Even assuming the SED tests to be conclusive on the presence of divalent europium, Persun's test results would only corroborate this element of the composition and not the halophosphate matrix portion of the composition. As set forth above, the record fails to establish that the compositions supplied to Persun were second step fired.

Kring likewise had no direct knowledge of the composition of the samples. The only evidence that Kring might have been aware of the sample composition prior to testing is the letter from Shaffer to Kring's supervisor. As above indicated, there is no clear correlation between Shaffer's notebook and that letter. The X-ray diffraction analysis performed by Kring would only be indicative of the matrix structure of the composition and not of the activator. There is no objective evidence that the samples tested by Persun were those tested by Kring or vice-versa.

The subsequent Record of Invention was prepared by co-inventor Shaffer and witnessed by two persons who testified to having "read and understood" the material therein. These witnesses did not testify to having actually observed a preparation of a composition embraced by the count. While this document alone may supply evidence of conception, it will not, without more, provide evidence of actual reduction to practice. The material contained therein is based on the inventor's unwitnessed notebook and test results performed by technicians who were unaware of what they were testing. The Record of Invention, therefore, fails to provide Mikus with the needed corroboration of a prior actual reduction to practice.

That courts must review the record as a whole and must apply a rule of reason, when evaluating corroborative evidence of

actual reduction to practice, does not dispense with the requirement for independent corroboration. Though the requirement does serve to impede fabrication and falsification, a finding of lack of corroborative evidence does not, of course, imply the occurrence of such untoward conduct. Mikus has not here shown sufficient consistency between the unwitnessed notebook and the other documentary evidence to warrant according the latter the status of independent corroborative evidence.

The decision of the board is *affirmed*.

*AFFIRMED.*