**David A. BERGES, Appellant,**

v.

**William J. GOTTSTEIN, Murray A. Kaplan and Alphonse P. Granatek, Appellees.**

**Appeal No. 79–618.**

United States Court of Customs and Patent Appeals.

April 10, 1980.

Janice E. Williams, Arkadephia, Ark., attorney of record for appellant.

Robert H. Berdo, Washington, D. C., attorney of record for appellees, Stephen M. Bodenheimer, Jr., Washington, D. C., of record.

Before MARKEY, Chief Judge, and RICH, BALDWIN, MILLER and KASHIWA,* Judges.

RICH, Judge.

This appeal is from the decision of the United States Patent and Trademark Office (PTO) Board of Patent Interferences (board) awarding priority on a single count

* The Honorable Shiro Kashiwa, Judge, United States Court of Claims, sitting by designation.

to Gottstein et al. (Gottstein), the senior party. We reverse.

This interference involves two applications, serial No. 536,760, filed by appellant Berges December 27, 1974, for "7 Acyl–3–(Substituted Tetrazolyl Thiomethyl) Cephalosporins and Intermediates for the Preparation Thereof" and serial No. 590,971, filed by appellee Gottstein on June 27, 1975, for "Antibacterial Agents." Appellee was accorded the benefit of an earlier application, serial No. 502,991, filed September 3, 1974, and was designated senior party. Only Berges filed an evidentiary record which included exhibits and testimony in affidavit form pursuant to agreement of the parties under 37 CFR 1.272(c).

The real parties in interest are Smith-Kline Corporation, assignee of Berges, and Bristol-Myers Company, assignee of Gottstein.

### The Issue

The sole issue is whether Berges' own evidence of his laboratory preparation of a compound admittedly within the count is adequately corroborated. The prepared compound relied upon is 7-trifluoromethyl-thioacetamido-3-(1-carboxymethyltetrazol-5-ylthiomethyl)-3-cephem-4-carboxylic acid, hereinafter referred to as "T-ceph-A," the short name used by the board. This cephalosporin is allegedly useful for treating bacterial infections in animal and man.

### Board Decision

Appellees, as senior party, elected to rely on their filing date of September 3, 1974, which becomes the critical date in this interference. Pursuant to 37 CFR 1.257, appellant, as junior party, has the burden of establishing priority by a preponderance of evidence. He chose to do so by presenting evidence of an actual reduction to practice. All acts relied upon by appellant occurred prior to the critical date and proof of dates is not an issue. The inventor's own testimony of his laboratory preparation of T-ceph-A was found by the board to be insufficiently corroborated by the affidavit evidence. Therefore, it held that an actual reduction to practice of a compound within the count prior to the critical date had not been established. The board regarded the evidence presented as corroborative of Berges' own testimony and notebooks showing preparation of T-ceph-A as "bottomed on hearsay."

### The Affidavit Evidence

Berges averred the following sequence of events, some of which were recorded in his unwitnessed notebook. Under his supervision, John J. Taggart reprepared an additional quantity of 1-carboxymethyltetrazole-5-thiol, designated JJT–7438–206, between March 4 and March 7, 1974. After supposedly confirming the structure by a comparison of its nuclear magnetic resonance (NMR) spectrum, Taggart gave Berges this compound.

A second requested compound, designated RMD–7630–118A, was prepared for Berges on March 12–13, 1974, by Dr. Robert M. DeMarinis. This compound, 7-trifluoromethylthioacetamido-cephalosporanic acid, sodium salt, was reacted with JJT–7438–206 on March 18, 1974, yielding T-ceph-A, a species within the interference count. Between March 18 and 22, Berges converted the free acid to a sodium salt, obtaining 210 mg. of the purified T-ceph-A which was coded as DB–7335–215f. All of this work was evidenced on pages 212–215 of his laboratory notebook No. 7335 (Berges Exhibit 14).

On March 22, 1974, a sample of DB–7335–215f was mailed to an independent Smith, Kline, and French (SK&F) analytical lab. A standard elemental analysis determining carbon, hydrogen, and nitrogen percentages was purportedly performed. The report received by Berges on March 25, 1974, indicated that the compound believed to be T-ceph-A was impure.

Another batch of T-ceph-A, identified as DB–7335–218g and 218h was prepared and purified, respectively, on March 21 and March 22. The combined samples were converted to the corresponding cyclohexylamine salt and coded DB–7335–218i. A re-

port of a subsequent elemental analysis by the lab indicated "good" agreement between the "Found" and "Theoretical" carbon, hydrogen, and nitrogen values expected for the structure of T-ceph-A, a molecular formula of $C_{20}H_{26}F_3N_7O_6S_3$, and a calculated molecular weight of 613.659.

On March 27, 1974, Berges personally recorded an NMR and an infrared (IR) spectrum of DB–7335–218i. Satisfied with the quantitative and qualitative analysis, he submitted the sample to Marie E. Knight for independent biological testing according to standard and established SK&F procedure. A 25 mg. "legal sample" was also submitted to Susan J. Bacino.[1]

An interim report from Knight regarding *in vitro* testing against selected bacteria was received by Berges on March 29, 1974. The compound was now designated SK&F No. 73025–W.[2] An *in vivo* test report was later received from Lillian Phillips in April.

A synthesis of T-ceph-A was reported to SK&F management in Berges' portion of a routine Bacterial Chemotherapy Semi-Monthly Summary for March 16–30, 1974. George L. Dunn, Berges' supervisor, also was given notice of the preparation of SK&F 73025–W in a January-April 1974 Chemistry Status Report.

DeMarinis was a senior member of the SK&F cephalosporin research team. In his affidavit, he confirmed the preparation of RMD–7630–118A, as identified in his notebook, on March 12. Furthermore, he stated that he gave this compound to Berges with the knowledge of its intended use in a reaction with 1-carboxymethyltetrazole-5-thiol in an attempt to prepare T-ceph-A.

John J. Taggart was an "immediate supervisee" of Berges during 1973–74 and also worked on cephalosporin research in the

same lab at SK&F. He declared that he prepared JJT–7438–165c and JJT–7438–206 at Berges' request. The latter compound he confirmed by NMR to be 1-carboxymethytetrazole-5-thiol which was given to Berges. Taggart was aware of its intended use in a synthesis of T-ceph-A which was attempted by Berges between March 18 and March 25.

According to her sworn statement, Edith A. Reich, a senior analytical chemist at SK&F, supervised the elemental analysis of DB–7335–215f by Susan J. Pinto, a technician, on March 22. A standard report form was completed for the carbon, hydrogen, and nitrogen percentages. The results were first routed for approval to Richard J. Warren, then to Berges. The report found in Berges' notebook, CTP–7854–124, corresponded to the one submitted to Warren.

Another request by Berges for an elemental analysis was received on March 26. This time the compound was DB–7335–218i. In accordance with Berges' instructions, Reich telephoned the results to Berges on March 27. Again, routine approval was sought prior to the relaying of a written report.[3]

Marie E. Knight, a senior microbiology technician at SK&F, testified to having the same day received a sample from Berges labeled SK&F 73025–W (DB–7335–218i). She also declared that an *in vitro* assay was subsequently performed on the sample on March 28–29. An interim *in vitro* evaluation was then submitted by her to the cephalosporin research team. She identified a copy of this report which was attached to her lab notebook.

The *in vivo* testing of SK&F 73025–W was conducted by Lillian Phillips, a SK&F microbiologist. According to her affidavit,

1. A "legal sample" refers to the portion of a supposedly novel compound which is recorded and stored by a designated custodian at a SK&F depository. An affidavit by Bacino confirms the receipt of a legal sample of the cyclohexylamine salt of T-ceph-A, DB–7335–218b, from Berges on March 28.

2. Mr. Atkinson, assistant director of the SK&F Investigational Products Laboratory, averred

that under his direction and according to routine, the samples of DB–7335–218i received from Berges on March 28 were assigned SK&F No. 73025–W.

3. Warren also swears to the routine routing sequence of both the DB–7335–215f and 218i analyses.

an *in vivo* mouse protection assay of this compound exhibited the following effectiveness:

> \* \* \* ED50's[4] of 3.1 mg/kg against *E.coli* and 0.4 mg/kg against *K.pneumoniae* upon subcutaneous administration whereas cephalexin, a commercial cephalosporin used as a control, exhibited ED50's of 35 mg/kg against *E.coli* and 18.8 mg/kg against *K.pneumoniae* in the same test.

No overt toxicity resulted from the subcutaneous administration of the drug.

Finally, Dr. George L. Dunn, supervisor of both Berges and DeMarinis during 1974, declared that at the time of the Berges Record of Invention he was aware that Berges was exploring the synthesis of compounds having a carboxy substituted triazolythiomethyl moiety at the 3-position of a cephem nucleus. In his administrative capacity over the study of cephalosporin compounds at the SK&F Upper Merion research facility, he received the following items: a legal sample of T-ceph-A from Bacino on or about March 28; a copy of the interim *in vitro* evaluation of SK&F 73025–W from Knight dated March 29; an interim report of the *in vivo* testing of SK&F 73025–W dated April 13 from Phillips on or about April 15; a copy of the Bacterial Chemotherapy Semi-Monthly Summary for the period March 16–30, 1974, reporting the preparation of T-ceph-A by Berges; and a copy of the January-April 1974 Chemistry Status Report of Berges et al. wherein the T-ceph-A synthesis was described.

## OPINION

■ The sole issue in this interference is whether the inventor Berges' own allegations of a prior actual reduction to practice of the invention of the count before Gottstein's filing date are corroborated by the independent circumstantial evidence outlined above. We are of the opinion that, viewed as a whole, the evidence unquestionably corroborates Berges' assertion of an actual reduction to practice.

■ The board erred in holding that the affidavits are merely bottomed on hearsay. It is not necessary the corroboration be in a single affidavit. When a reasonable analysis is made of the evidence *in toto*,[5] proof of the existence of T-ceph-A and absence of fraud on the part of appellant are clearly shown. It is not required that one of the affiants shall have seen Berges form T-ceph-A by mixing specific reactants together in the manner described in the unwitnessed Berges notebook. Neither did the significance of this event have to be understood. *Mikus v. Wachtel*, 542 F.2d 1157, 191 USPQ 571 (CCPA 1976).

Together, the facts set forth in the affidavits trace a highly organized procedure routinely practiced within SK&F for identifying, preserving, and testing newly synthesized compounds developed by the cephalosporin research team. In terms of independent testimony, Reich performed a routine elemental analysis on an adequately marked sample, DB–7335–218i, believed by Berges to contain T-ceph-A. While the results were not definitive, the correspondence between the theoretical and empirical values reinforced the reasonableness of Berges' conclusions. Of course, alone these independent tests indicate merely a good probability that T-ceph-A was substantially present in the SK&F 73025–W sample. But additional corroboration is provided by relevant related independent events.

The likelihood of this compound being T-ceph-A is further supported by the testimony of Taggart and DeMarinis. Each testified to having given Berges a compound now known to be useful in synthesizing T-ceph-A. Certainly neither claims to have seen Berges combine JJT–7438–206 with RMD–7630–118A. They were only reasonably "aware" of the intended purpose for

---

4. ED50 or the mean effective dose is an extrapolated term used chiefly to characterize drug potency. It represents the amount required to produce a response in 50% of the tested subjects.

5. Interpreting corroborating evidence in this manner has often been referred to as employing a "rule of reason," *Berry v. Webb*, 56 CCPA 1272, 412 F.2d 261, 162 USPQ 170 (1969).

which Berges needed these highly complex compounds. But considering the field of investigation, we see no other substantial use for these compounds at that time except the research team's stated general objective of synthesizing substituted cephalosporins to study their antibacterial properties.

Proof of the utility of SK&F 73025–W is independently provided by Phillips and Knight. According to an *in vitro* evaluation, Berges Exhibit 29, the T-ceph-A sample performed equal to or better than other known cephalosporins in exhibiting anti-microbial activity. The *in vivo* test was also equally successful. Again, although these tests, individually, are not conclusive, the absence of contradiction and internal conflict in the present assemblage of evidence inexorably strengthens the case made by appellant for independent corroboration of the inventor's testimony.

Spectrum analyses of SK&F 73025–W were not independently conducted. Berges alone obtained NMR and IR spectra on DB–7335–218i. This fact, however, does not reduce their value to that of a mere self-serving statement. The authenticity of these documents is controlling. Any IR/NMR spectra of a complex heterocyclic organic compound would be virtually impossible to produce without using the compound itself as the tested sample. Even if one could "dry-lab" the results, i. e., create data without actual testing, the existence of any motivation to do so well before the filing of an application by either party is tenuous at best. Furthermore, Atkinson stated that the SK&F Data Sheet for 73025–W, Berges Exhibit 22, was received on March 28. In the analytical data section, satisfactory results for both IR and NMR tests were indicated. A reasonable inference is that the submitted spectral analyses were timely performed as stated. As for the graphical data on Exhibit 22, the structural inferences gleaned therefrom stand by themselves even at present. The board did not question that the T-ceph-A structure was represented. Therefore, appellant did not have to submit an affidavit which specifically interpreted the results.

Equally relevant to the issue of corroboration of an actual reduction to practice are the routine pathways by which knowledge of ongoing research was disseminated throughout the cephalosporin research team. Berges did not simply decide by himself to synthesize a compound from the available precursors received from Taggart and DeMarinis. He was involved in a supervised research program directed toward substituted cephalosporins. Dunn, Berges' supervisor, agreed that Berges should concentrate his research efforts on synthesizing other 3-carboxyalkyltetrazolylthiomethyl substituted cephalosporin compounds. Due to the work of DeMarinis, who was also under Dunn's supervision, on the use of trifluoromethylthioacetamido as a 7-position substituent at and prior to this time, T-ceph-A was considered one of the top priority compounds for synthesis in 1974.

Along with a Record of Invention, Berges contemporaneously submitted a biweekly and a quarterly report detailing the synthesis of T-ceph-A and its subsequent *independent testing*. With all of the documentation briefly reviewed above, which consistently fits the affidavit evidence and planned activities of the members of the research team directed toward synthesis of T-ceph-A, we hold the production of T-ceph-A as and when asserted by Berges to be established by more than a preponderance of the evidence. He has therefore sustained his burden of proof and the corroboration required by patent law exists.

A different situation existed in *Mikus v. Wachtel*, supra, cited by the board as requiring acts entirely independent of the inventor. At first glance, the problem there appears similar to the instant one. An unwitnessed notebook was submitted with no firsthand knowledge of a synthesis by coworkers. Independent analyses of a compound within the count, however, were performed. A critical difference in *Mikus* was the lack of cohesiveness in the web of allegedly corroborative evidence on which Mikus relied. As this court noted, consistency among the individual components of evi-

dence was not clearly established. For example, some of the analyses were performed on compounds not carrying the proper label. Significantly, the inventor had specifically assigned a suffix to his label which denoted the completion of a necessary process step in the synthesis of the composition of the count. Such a situation does not exist in this case.

■ Nor can we agree with the board's statements implying that corroborators must have been present at the actual work site or have known something about it other than what was reported to them, for which it cited *Patterson v. Clements*, 30 CCPA 1262, 136 F.2d 1002, 58 USPQ 539 (1943), a case involving a single corroborating witness. Corroborative testimony does not necessarily have to be an actual witnessing of the reduction to practice by one who understands what is going on in order to be adequate. Sufficient circumstantial evidence of an independent nature can satisfy the corroboration rule.

■ Appellee likewise errs in asserting that corroboration is not "independent" when based on acts not personally observed. Certainly the analyses and tests performed by other SK&F personnel do not diminish in evidentiary value solely due to a lack of any actual witnesses of the synthesis of T-ceph-A. *Senkus v. Johnston*, 35 CCPA 1008, 166 F.2d 597, 77 USPQ 113 (1948), cited by appellee, and *Patterson*, supra, cited by the board, both exemplify the more rigid approach to determining the weight given to independent testimony in support of an inventor's statements which were obtained prior to the development of the "rule of reason" approach. In the final analysis, each corroboration case must be decided on its own facts with a view to deciding whether the evidence as a whole is persuasive.

For the above reasons, we hold that the junior party Berges sustained his burden of proving prior actual reduction to practice.

The decision of the board awarding priority to Gottstein is *reversed*.

REVERSED.